### DALBEATTIE STEAMSHIP CO., Limited, v. CARD.

#### (District Court, E. D. South Carolina. July 14, 1893.)

SHIPPING—CHARTER PARTY—CANCELLATION.
  A charter party provided for cancellation by the charterer, "should the steamer not arrive at her loading port and be ready in all respects for this charter to commence on or before February 15th, 1892." It was further provided that the charter should not commence until the morning after the steamer was ready to receive cargo at the place of loading, and customary written notice thereof had been given before noon on the day the steamer was ready. On February 13, 1892, the steamer entered the port of Charleston, and went to quarantine. On the forenoon of that day her master reported her arrival to the charterer, who answered that the master had reported too late, and the charter was canceled. On the afternoon of the 13th the steamer came up to the city, and was assigned a berth by a subcharterer, with the knowledge of the charterer. There she remained on the 14th (Sunday) and 15th. On the forenoon of the 15th her master again notified the charterer that he was ready. *Held*, that the charterer had no right to cancel the charter.

In Admiralty. Libel by the Dalbeattie Steamship Company, Limited, against H. St. Julian Card, doing business under name and style of Henry Card & Son, for breach of charter party. Decree for libelant.

Bryan & Bryan, for libelant.
J. N. Nathans, for respondent.

SIMONTON, District Judge. The steamship Dalbeattie, under charter to Henry Card & Son, entered the port of Charleston 13th February, 1892, in the forenoon. She went to the quarantine station, about two miles from the city. On the morning of 13th February, 1892, in the forenoon, her master, in person, reported her arrival to Henry Card & Son, charterers, and to the East Shore Terminal Company. He had been informed by letter that his vessel had been subchartered to that company. The agent of the company referred him to Henry Card & Son for an answer to his notice. The answer, in effect, was that he had reported too late, and that the charter was canceled. On the afternoon of 13th February, at about 4 o'clock, the Dalbeattie came up to the city

of Charleston, and her master asked for his berth, which, under the charter party, was to be selected by the charterer. He was assigned a berth abreast of the wharves of the East Shore Terminal Company. This was done by this company, with the knowledge and assent of the charterer. She remained in this berth thenceforward, through that afternoon and the next day, (14th,) which was Sunday, and on Monday. On Monday, (15th,) before noon, the master of the Dalbeattie again notified the charterer that he was ready. His notification was disregarded. The charterer insisted that the charter was canceled. Freights having fallen, the master of the Dalbeattie was compelled to content himself with much lower freight engagement with another shipping merchant, and brings this action against Henry Card & Son for his loss.

This case is one in which the respondent stands on his strict legal right. There is no room for sentiment. If he is correct, his right must be accorded to him. His charter party is dated 13th January, 1892. Such is the ingenuity of the human mind that questions of a variety almost infinite can arise in construing the same words under varying circumstances. The question for us to decide is, did this steamer arrive at this port, and report herself, within the time prescribed by the charter party? and thus did the condition of things arise which authorized the charterer to cancel the charter party? The words are:

"Should the steamer not arrive at her loading port and be ready in all respects for this charter to commence on or before February 15th, 1892, the charterer may cancel the charter."

We are to construe these words, "for this charter to commence," and the controlling authority in construing them is the instrument itself. The use of the same words in other charters, and the construction courts have given them, aid us. The instrument itself, if it speaks, controls us. The clause of this charter party immediately preceding the clause just quoted says:

"It is agreed that this charter shall not commence until the morning after the steamer is ready to receive cargo at the place of loading, all of her holds being cleared and clean swept, and customary written notice thereof is given to the charterers or their agent, and such notice must be given before noon on the day the steamer is ready."

So the charter does not commence until her arrival at the place of loading,—that is to say, "Charleston, S. C., or as near thereto as she can safely get,"—and until 24 hours after she has given written notice of such arrival, and of her readiness to receive cargo, by reason of all of her holds being cleared and clean swept, and the charter must commence on or before 15th February, 1892. If we accept the construction that the words, "the charter will commence," apply to the charter itself, and were not simply intended to fix the beginning of the lay days, as was the construction in Fearing v. Cheeseman, 3 Cliff. 96, then the receipt of the notice did not give to the charterer the right at once and thereupon to begin loading. That right did not begin until 24 hours afterwards, and consequently this last was the period fixed for the readiness of the steamer to receive cargo. In other words, the charter did not

contemplate that she must be ready to receive cargo at the date of the notice, but 24 hours afterwards. This appears from another part of the charter party. The ship had to report on her arrival, but she must load at such wharf or dock as the charterers should select. So, necessarily, at the time of reporting, she could not be in the place at which she was to load, and so be ready to receive cargo, but was compelled to remain in the stream, or select a dock at her peril. This notice of 24 hours was intended to prevent the charterer from being taken by surprise. He had to select his dock, and prepare his cargo. The time was given him so that he should not incur demurrage. Now, it is true that, when he reported, the master mentioned that his ship was at quarantine. But in the same breath he stated that she was being fumigated, and would be up after noon. She did in fact come up, with the knowledge of Card & Son and the East Shore Terminal Company, was at a berth selected by them that afternoon, spent Sunday there, and at daylight on the morning of 15th was ready, in all respects, for a cargo. To hold that this charter was open for cancellation, under these circumstances, would be contrary to the broad principles of the civil and maritime law.

Let the amount of damage be computed by the clerk, and a decree entered for this sum and costs to libelant.